## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 30 2018, 7:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Justin R. Wall
Wall Legal Services
Huntington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of L.S., C.H., and A.H. (Minor Children), and L.H. (Mother),[1]

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

May 30, 2018

Court of Appeals Case No. 90A05-1712-JT-2954

Appeal from the Wells Circuit Court

The Honorable Kenton W. Kiracofe, Judge

Trial Court Cause Nos.
90C01-1607-JT-10
90C01-1607-JT-11
90C01-1607-JT-12

---

[1] L.A.H. ("Father") does not appeal the termination of his parental rights. However, pursuant to Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal.

**Mathias, Judge.**

[1]    L.H. ("Mother") appeals the order of the Wells Circuit Court terminating her rights to her minor children L.S., A.H., and C.H. (collectively "the Children"). On appeal, Mother contends that the Indiana Department of Child Services ("DCS") presented insufficient evidence to support the trial court's decision to terminate her parental rights.

[2]    We affirm.

## Facts and Procedural History

[3]    Mother and L.A.H. ("Father") met in Dubois County, Indiana and were married in February 2009. At the time, they had one daughter, L.S., who was born in June 2006. Mother then had two boys with Father: A.H., who was born in January 2011, and C.H., who was born in May 2012. Mother and Father moved to Wells County, Indiana sometime in 2013 because Father's family is located there.

[4]    In August 2013, Father was charged with and pleaded guilty to Class D felony domestic battery against Mother, and he was ordered to serve six months executed in the Department of Correction. On January 29, 2014, while Father was incarcerated, DCS received a report that Children were living with Mother in a mobile home without heat. The next day, DCS case manager Angie Vachon ("Vachon") made an unannounced visit to the trailer and found that: (1) the living room was the only room in the mobile home with heat, the source of which was two electric heaters; (2) there was no running water; (3) trash and

clothing were strewn everywhere; and (4) the Children were improperly clothed for the cold weather. The Children were removed that evening and placed in a foster home.

[5] On February 3, 2014, the trial court held an initial hearing in which the court found that further detention in foster care was necessary to protect the Children. Mother admitted that the Children were children in need of services ("CHINS") on May 1, and the court issued a dispositional decree with respect to each child. As part of the decrees, the Children would remain in foster placement, and DCS would maintain contact with both parents, foster placements, and the service providers. Mother was also ordered to successfully complete supervised visitation, home-based services, random drug screens, home-based case management, and home-based therapy.

*A. Mother's Actions after the Dispositional Decree*

[6] Later that same month, after the Children were adjudicated CHINS, Mother moved back to Dubois County to care for her sick father. Mother wanted to try and have the Children transferred closer to Dubois County "which would be easier for [Mother] to get everything back on track with [Children]." Tr. Vol. 2, p. 177. While in Dubois County, Mother had monthly visitations with the Children for two hours at a time in Wells County, since services remained in place there because Mother indicated she was planning to return. However, in November 2014, Mother pleaded guilty to Class A misdemeanor driving while suspended in Dubois County, and she was ordered to serve her sentence on

work release there. When Mother was released from work release three months later, in February 2015, she moved back to Wells County.

[7] In Wells County, Mother found a job as a waitress, and she stayed first in a hotel and then with a friend. She took part in weekly supervised visits with the Children, but a home-visit never took place because DCS was unable to contact the woman Mother was staying with. Four months later, in June 2015, Mother again moved to Dubois County because she could not find a place to live on her own with the money she was earning at the restaurant in Wells County. Her plan when she moved was to "get a place, get a job, and try and get services done there since [Mother had] been having issues getting services." *Id.* at 179. In Dubois County, Mother contacted Southern Hills Counseling, and they provided her with services, including drug screens, a clinical assessment, and strategies for parenting skills. However, no one from Southern Hills Counseling ever observed Mother interact with Children or attended a supervised visitation.

[8] Terri Miller ("Miller"), a family preservation case manager with Family Centered Services in Wells County, provided the supervised visitation and case management services for Mother and the Children from July 2014 to July 2015. In her testimony at the December 14, 2016 fact-finding hearing, Miller explained that Mother was consistent with her two-hour visits with Children when she was in Wells County. But when she was in Dubois County, visits diminished to only once a month because Wells County and Dubois County are roughly four hours apart, and because Mother lacked consistent transportation since she did not have a license. Miller testified that when

Mother was in Dubois County, Children were less cooperative and they "did better with [Mother] when they saw her on a more regular basis." *Id.* at 91.

[9] Naomi Rainwater ("Rainwater"), a family coach for SCAN,[2] took over the responsibility of Mother's supervised visits and case management in September 2015. At the December 15, 2016 fact-finding hearing, she explained that the consistency of Mother's two-hour visits fluctuated due to her being so far away. Rainwater also explained that she reduced the duration of Mother's visits with the Children down to one hour after the first visit "because of the children's behavior and how chaotic the visit[] became." *Id.* at 141. Mother's boyfriend at the time, C.S., began attending the visits in November 2015, and he provided Mother with transportation. From the time Mother's work-release ended in Dubois County in February 2015, she could have had her driver's license reinstated if she paid a fee of approximately $700, but she had not done so at the time of the December 2016 or February 2017 fact-finding hearings.

[10] In January 2016, Mother married C.S.,[3] and the duration of the visits with the Children was also increased to two hours. However, a visit in February 2016 had to end early due to behavioral issues of A.H. and C.H. Rainwater explained during the hearing:

> Anything past an hour seemed to be overwhelming. [] I think a
> lot of it had to do with the - how often visits were happening,

---

[2] SCAN stands for Stop Child Abuse and Neglect.

[3] Mother and Father separated in 2014 but were not formally divorced until January 2016.

which were not frequent enough. [] [T]he children have a lot of needs, and I don't know that she - I don't wanna say it - I don't know if it's a lack of ability, but just because she didn't see them often enough, there wasn't time to practice the skills that were needed to manage them.

*Id.* at 145. C.S. continued to transport and accompany Mother for bi-monthly visitations up to and through the February 2017 hearing in this case.

[11] Alyssa Bennett ("Bennett"), a Wells County caseworker with Park Center Counseling, began monitoring supervised visitation and case management services in June 2016. Visits began taking place for one hour every other week because that is all Bennett believed Mother could handle at the time. Bennett testified that C.S. is a positive influence on the Children and is helpful with Mother in her parenting skills. *Id.* at 122. Bennett would have liked to see more frequent visits, but not longer. However, she explained that this was impractical due to how far away Mother lives from the Children.

[12] Mother and C.S. live in a three-bedroom home in Dubois County which was described as safe, suitable, and nice. Tr. Vol. 3, p. 36. Mother does not currently work, and she explained that this is because:

> We have - me and my husband - have come up with a plan: for right now, until we figure what's goin' on with the children, I was - I'm taking care of the home, gettin' the house set up, we've furnished the rooms, we've been working with our new home-based worker, getting everything set up; and then if I wanna get part-time job, he said it was fine, but right now I don't need to work so I'm taking care of everything in the home, gettin' it all together.

Tr. Vol. 2, pp. 180–81. Mother asserts that Husband is able to financially support her and the Children. She began taking part in case management sessions with a client representative from Southern Hills Counseling Center in June 2016. However, the Southern Hills representative has never observed Mother with Children. And as set forth above, at all relevant times, Mother's driver's license could have been reinstated upon payment of $700 in court and related fees, and a vehicle would have been available for her use.

*B. Children's Situation after the Dispositional Decree*

[13] Throughout the CHINS proceedings, the Children have been in and out of several foster homes. The Children were initially all placed together with the Alvarados; however, A.H. was removed and placed in a therapeutic home with Cindy Scotten in early 2014. A.H. was removed because "it was determined that he would [] do better at Cindy's because she's really experienced with . . . young boys or children that need a lot of services." Tr. Vol. 3, p. 6. A.H. did well at Scotten's; however, due to unforeseen circumstances, he was placed back with his brother and sister at the Alvarados in September 2014 where they remained until May 2015.

[14] The Children were then placed with Teffany[4] and John Shumaker in a pre-adoptive foster home. Initially things went well, but DCS case manager Vachon testified that "everything fell apart." *Id.* at 10. A.H. and C.H. began not

---

[4] Teffany was L.S.'s teacher and had developed a strong bond with Children. *See* Tr. Vol. 3, p. 9.

listening to Teffany, and they physically assaulted her. John became frustrated, and the stress ultimately became too much for the Shumakers. It was while the Children were with the Shumakers that DCS's plan went from reconciliation to termination because Mother and Children still could not handle anything more than supervised visitations.

[15] After the Shumakers, the Children were removed and placed with Brenda James in September 2015. A.H., four-years old at the time, began exhibiting more disturbing behaviors including: (1) caressing his private parts in front of girls; (2) forcing James's biological daughter to touch his private parts; (3) he jumped a fence at day care, grabbed a stick, jumped back over the fence and began hitting a little girl; (4) he physically assaulted James on several occasions; and (5) he regularly exhibited severe anger issues. As a result, A.H. was removed from James's home, and he was placed with Shelly Stultz. A.H. regularly sees a counselor at school to work on his anger issues, and he is on several medications. Stultz noted that A.H. is getting better and doing well in school.

[16] L.S. and C.H. have also displayed concerning mental health issues. L.S. has been diagnosed with PTSD, and she takes part in regular counseling sessions. James explained during the hearing that L.S. has a hard time telling the truth and fabricates stories on a daily basis. Tr. Vol. 2, p. 50.[5] C.H. also has regular

---

[5] L.S. also alleged that Father sexually molested her prior to the 2013 domestic battery. *See* Tr. Vol. 3, p. 28.

counseling and therapy sessions to help with behavioral issues. However, C.H. calmed down significantly after A.H. was removed from James's home, and C.H. has also been weaned off all medication.

DCS filed petitions to terminate parental rights on June 4, 2015, and November 23, 2015. However, DCS moved to dismiss both petitions without prejudice pursuant to Indiana Trial Rule 41(A)(2). Then on July 5, 2016, DCS filed a third petition for termination, and fact-finding hearings were held on December 14 and 15, 2016, and on February 15, 2017. At the time of the hearings, the case had been open for thirty-five months. During their nearly three-year CHINS status, C.H. and L.S. had been placed in four foster families, and A.H. had been placed in six, because of their individual psychiatric needs and behavioral issues. On September 29, 2017, the trial court issued findings of fact and conclusions of law granting DCS's petitions and terminating Mother's and Father's parental rights. Mother now appeals.

## Termination of Parental Rights

We have consistently explained that the purpose of terminating parental rights is *not* to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for the termination of such rights when the parents are unable or unwilling to meet their responsibilities as parents. *Id.* Indeed, the parent's interests must be subordinated to the children's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[19] The termination of parental rights is controlled by Indiana Code section 31-35-2-4(b)(2), which provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

[20] The burden is on DCS to prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *G.Y.*, 904 N.E.2d at 1260. As Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of that subsection has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a). If the court does not find that the allegations in the petition are true, it shall dismiss the petition. *Id.* at § 8(b).

[21] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We

consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[22] Indiana Code section 31-35-2-8(c) provides that the trial court "shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" to either terminate a parent-child relationship or to dismiss the termination petition. As it did here, when the trial court enters such findings and conclusions of law, we apply a two-tiered standard of review. *A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. We first determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Id*. (quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)). If the evidence and inferences support the trial court's decision, we must affirm. *Id*.

## Discussion and Decision

[23] On appeal, Mother argues that the trial court's conclusion that the continuation of the parent-child relationship posed a threat to Children's well-being is not

supported by clear and convincing evidence.[6] In considering her argument, we note that a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before termination of the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). And to evaluate whether continuation of the parent-child relationship poses a threat to the child, a trial court "should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation" while also judging a parent's fitness to care for his child as of the time of the termination proceedings, taking into consideration evidence of changed conditions. *In re A.P.*, 981 N.E.2d 75, 81 (Ind. Ct. App. 2012).

[24] Here, Mother alleges that "[t]he basis for the conclusion that the continuation of the parent-child relationship poses a threat to the well-being of the children appears to be based primarily on the lack of advancement by Mother in visitation with the children." Appellant's Br. at 16–17. And in Mother's view, this is not enough to satisfy DCS's burden of proof justifying termination.

[25] Mother cites to our supreme court's decision in *In re I.A.*, 934 N.E.2d 1127, 1136 (Ind. 2010), to support her contention. In that case, I.A. was born out of

---

[6] Because we conclude that DCS proved that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to Children's well-being, we need not address Mother's arguments directed at the removal prong of Indiana Code section 31-35-2-4(b)(2)(B). *See In re A.K.*, 924 N.E.3d at 220 (noting that section 4(b)(2)(B) is written in the disjunctive and that the trial court is required to find that only one prong of subsection (b)(2)(B) has been established). Also, Mother fails to present any argument that termination of her parental rights was not in the Children's best interests, and therefore, we do not address the trial court's finding on this issue on appeal.

wedlock to mother and father, and it was a few months after I.A.'s birth that mother told father that I.A. was his child. I.A. was one of mother's seven children ranging in age from birth to fourteen years old. Mother's children were ultimately removed from her care due to lack of supervision. With respect to I.A., father was named as a party, and he agreed that I.A. was a child in need of services.

[26] Father participated in visitation with I.A., but it was discontinued because paternity had not yet been established. DCS subsequently filed a petition to terminate both mother's and father's parental rights. Father sought paternity testing and filed a petition to establish paternity, after which he was allowed supervised visitation with I.A. At a review hearing, the trial court noted that "Father has complied with the case plan. . . . Father has enhanced his ability to fulfill parental obligations. . . . Father visits regularly with the child. . . . Father is cooperating with DCS." *Id.* at 1130–31. Despite these findings, the trial court granted DCS's petition to terminate Father's parental rights. Notably, the trial court found that continuation of the parent-child relationship posed a threat to I.A. because "the father . . . has not bonded with the child." *Id.* at 1131.

[27] On appeal, our supreme court found that DCS "failed to prove by clear and convincing evidence that there is a reasonable probability that by continuing the parent-child relationship, the emotional or physical well-being of I.A. is thereby threatened." *Id.* 1137. Important factors for the *In re I.A.* court were that: (1) father initially took part in one to one-and-one-half-hour weekly visitations with I.A. outside of father's home, which increased to two hours at father's

residence; (2) father never cancelled or missed a single visit; (3) other than parental aide, no services were provided to father to increase his parenting skills; and (3) DCS case manager never explained why continuation of the parent-child relationship with respect to father posed a threat to the well-being of I.A. *Id.* at 1135–36.

[28] Mother compares her situation to the facts of the father in *In re I.A.* and maintains that her marriage to C.S., her increased participation in services, and the improvement in visitations once mother remarried all fail to demonstrate by clear and convincing evidence that a continuation of the parent-child relationship between Mother and the Children poses a threat to their well-being. We disagree and find *In re I.A* distinguishable on its facts.

[29] In contrast to *In re I.A.*, here DCS worked hard to reunite the Children with Mother and offered her several opportunities to visit with the Children that she declined. When Mother first moved to Dubois County to care for her father, DCS case manager Vachon testified, "[Mother] could have visitation anytime she came. She said she was gonna come every week. She was gonna visit with them as much as she could, she would find transportation, and she would get her kids back, and she would be with them every - every week." Tr. Vol. 3, p. 19. But she did not.

[30] Mother's visits with Children when she was in Dubois County were "sporadic" and "[s]ometimes it was longer than a month." Tr. Vol. 2, p. 85. "[T]he visits [] became whenever she could schedule." *Id.* Although Mother did have issues

with transportation because she did not have her license, at all relevant times, she had the ability to get her driver's license reinstated by paying a fee of approximately $700. However, Mother chose not to do so, and even after her marriage to C.S., she failed to find and maintain a job through which she could have earned enough the money to get her license reinstated. Moreover, after the December 15, 2016 hearing, Mother was offered an opportunity to visit Children, "but she didn't have one; she didn't ask for one, and [Mother and C.S.] returned back to Dubois County." Tr. Vol. 3, p. 79.

[31] At the time of the hearings, Children had been removed from Mother for thirty-five months, and in that time, our review of the record indicates that Mother has only lived in Wells County, the location of the Children, for a total of approximately six months. Also, after thirty-five months, Mother has never had the ability to take part in an unsupervised visitation with Children or to have a home-visit.[7] Beth Webber, the guardian-ad-litem since the inception of this case testified:

> Mom moving away, I feel, has told the Court what her priority has been. Her priority has been getting her life more stable, but it's been away from where the kids were, and so it's made it very difficult to put into practice what she's been trying to learn through her home-based services. So that's - the difficulty is: the parents haven't been able show long term that they can manage

---

[7] Notably, the Children were closest to being permanently placed with Father in April or May of 2016. Vachon testified, "[The Children] were close; almost, like, a week away from their trial home visit," and "[Father] was gonna get the children back." Tr. Vol. 3, p. 13. However, Father subsequently failed a drug test and then failed to complete all of DCS's required services.

these children and maintain the stability necessary to properly parent them and keep them safe for a long period of time.

Tr. Vol. 3, p. 72. Vachon also testified that she did not think the Children should go to live with Mother because she could not ensure the Children's safety. Vachon explained, "What concerns me is that [Mother] struggles to get past an hour of a supervised visit with her children. So I don't know what's gonna happen if it's two hours unsupervised or three or overnight." *Id.* at 22. If Mother is at times unable to successfully complete a one-hour supervised visitation with the Children, then it is unlikely she will be successful taking care of them overnight and with no supervision in place.

[32] Additionally, Vachon is dedicated to finding pre-adoptive homes for the Children. And by remaining in Wells County, the Children will continue to participate in mental health counseling and receive special services in their respective schools. We cannot say with any certainty that the Children would be afforded the same level of services if they were placed back in Mother's care in Dubois County.

[33] For all of these reasons, we conclude that clear and convincing evidence supports the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to Children's well-being.

# Conclusion

[34]   We do not find any case in which we are asked to review a trial court's decision to terminate a parent's rights to their children an easy decision to make. We have no reason to doubt Mother's claims that she and her three Children love one another and are bonded. We also acknowledge that Mother has visited the Children as she felt she was able to do so. She has secured a stable and safe three-bedroom home with C.S. in Dubois County. And Mother has actively sought out resources and services to help increase her parenting skills through Southern Hills Counseling Center in Dubois County.

[35]   But this case is somewhat unique in the fact that, over a three-year CHINS status and placement in multiple foster homes, it has become clear that A.H. has serious psychiatric and behavioral problems that have required that he live apart from L.S. and C.H., both of whom have psychiatric and behavioral problems of their own. Considering Mother's limited parenting skills, reunification of this family is not only unrealistic; it would be dangerous to each and all of the Children and, sadly, perhaps others.

[36]   For all of these reasons, and based on the unique facts and circumstances before us, we cannot say that the trial court clearly erred when it terminated Mother's parental rights. Accordingly, we affirm.

Riley, J., and May, J., concur.